IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LUCY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | NO. 3:26-cv-00998 |
| JONATHAN SKRMETTI, et al., | ) | JUDGE RICHARDSON |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

In this putative class action, Plaintiffs challenge Section 1 of Tennessee House Bill 1704 ("H.B. 1704"), a recently enacted provision of Tennessee state law that went into effect on July 1 of this year. Section 1 of H.B. 1704 prescribes criminal penalties in certain circumstances for aliens[1] who are and remain within the state of Tennessee and against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a).[2]

Pending before the Court are three motions. The first motion is a "Motion for Preliminary Injunction and Memorandum of Law in Support" (Doc. No. 6, "Preliminary Injunction Motion"),

---

[1] "Alien" is a term that in various contexts has long had an established legal meaning that may vary just slightly across legal contexts, as discussed in a footnote below. In the instant context (as well as other legal contexts), "alien" (as contrasted with "illegal alien") is not a derogatory term but rather simply a legal term that carries certain context-specific consequences.

[2] This is the second such challenge to Section 1 of H.B. 1704 brought by Plaintiffs. The first such challenge was in a case styled: *Lucy v. Skrmetti*, No. 3:26-cv-00763 (M.D. Tenn.) ("*Lucy I*"). In citing the docket in *Lucy I*, the Court will use the following format for citations: (*Lucy I* Doc. No. _). The Court dismissed *Lucy I* for lack of subject-matter jurisdiction. (*Lucy I* Doc. No. 48). An appeal of *Lucy I* is now pending before the Sixth Circuit. (*Lucy I* Doc. No. 68).

filed by the two named Plaintiffs, Lucy and Benjamin.[3] Via the Preliminary Injunction Motion, Plaintiffs seek a pre-enforcement injunction[4] barring the enforcement of Section 1 of H.B. 1704. (Doc. No. 6 at 26).[5] Supporting the Preliminary Injunction Motion are the respective declarations of Lucy (Doc. Nos. 6-1, 6-3) and Benjamin (Doc. Nos. 6-2, 6-4). Also supporting the Preliminary Injunction Motion is an exhibit composed of various court orders and federal immigration documents that detail Plaintiffs' respective immigration statuses. (Doc. No. 6-5).[6] Defendants[7]

---

[3] Lucy and Benjamin are not the actual (respective) names of Plaintiffs. Instead, they are (respective) pseudonyms that Plaintiffs have chosen (and sought leave via a motion (Doc. No. 8, "Pseudonym Motion")) to use. Plaintiffs' Pseudonym Motion (Doc. No. 8) is also pending and is resolved herein and in the accompanying order.

[4] To say that Plaintiffs seek a "pre-enforcement injunction" is to say that Plaintiffs seek to enjoin the enforcement of Section 1 of H.B. 1704 prior to Section 1 of H.B. 1704 being enforced against Plaintiffs in particular.

Likewise (and more generally), when referring to an action or suit as being a "pre-enforcement" action or suit, the Court means to say that the action (like this action) is challenging a particular statute prior to that statute's enforcement against the plaintiff(s) bringing the action.

[5] Although the Preliminary Injunction Motion does not specify the precise scope of the requested injunction, the Court discerns that Plaintiffs seek an injunction barring enforcement of Section 1 of H.B. 1704 as to Plaintiffs and members of the putative class in this case.

[6] Each of the exhibits filed in support of the Preliminary Injunction Motion are redacted in part. Plaintiffs have filed under seal at Docket No. 10 a filing that contains unredacted excerpts of the exhibit at Docket No. 6-5. Plaintiffs have also sought leave via a motion (Doc. No. 9, "First Motion to Seal") to maintain the filing at Docket No. 10 under seal. The Court will address the First Motion to Seal via a separate order.

[7] When using the term "Defendants" herein, the Court is referring collectively to all defendants in this action, namely Tennessee Attorney General and Reporter Jonathan Skrmetti ("General Skrmetti"), Commissioner of Safety and Homeland Security for the State of Tennessee Jeff Long ("Long"), District Attorney General for the Sixth Judicial District of Tennessee Charme Allen ("Allen"), District Attorney General for the Ninth Judicial District of Tennessee Russell Johnson ("Johnson"), District Attorney General for the Thirteenth District of Tennessee Bryant C. Dunaway ("Dunaway"), District Attorney General for the Fifteenth Judicial District of Tennessee Jason Lawson ("Lawson"), District Attorney General for the Twentieth Judicial District of Tennessee Glenn Funk ("Funk"), District Attorney General for the Twenty First Judicial District of Tennessee Stacey Edmonson ("Edmonson"), District Attorney General for the Twenty Third Judicial District of Tennessee Ray Crouch ("Crouch"), District Attorney General for the Twenty Fourth Judicial District of Tennessee Neil Thompson ("Thompson"), District Attorney General for the Twenty Fifth Judicial District of Tennessee Mark Davidson ("Davidson"), District Attorney General for the Twenty Sixth Judicial District of Tennessee Jody Pickens ("Pickens"), District Attorney General for the Twenty Eighth Judicial District of Tennessee Fred Agee ("Agee"), and District Attorney General for the Thirtieth Judicial District of Tennessee Steve Mulroy ("Mulroy").

have filed a response (Doc. No. 26, "Preliminary Injunction Response") in opposition to the Preliminary Injunction Motion. Plaintiffs have filed a reply (Doc. No. 35, "Preliminary Injunction Reply") in further support of the Preliminary Injunction Motion.[8]

The second motion is Plaintiffs' "Motion for Class Certification and Memorandum of Law in Support" (Doc. No. 7, "Class Certification Motion"), wherein Plaintiffs request certification of the putative class in this case under Rule 23(b)(2).[9] Supporting the Class Certification Motion are two declarations (Doc. Nos. 7-1, 7-2) of Plaintiffs' counsel. Defendants have filed a response (Doc. No. 29, "Class Certification Response") in opposition to the Class Certification Motion.

---

[8] Non-party United States of America has filed a Statement of Interest (Doc. No. 31), therein stating that it is the position of the United States of America that Section 1 of H.B. 1704 is not preempted by federal immigration law.

[9] The putative class in this case is defined as:

> All noncitizens who, now or in the future, are aliens against whom a valid final order of removal has been outstanding for 90 days or longer by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a), and who intentionally fail or refuse to depart from Tennessee.

(Doc. No. 7 at 4). The Court will refer herein to this proposed class as the "Putative Class." Plaintiffs specifically seek what they call "provisional" certification of the Putative Class. Given the Court's decision herein deferring decision on the Class Certification Motion, the Court declines at this juncture to discuss the propriety of (or mechanism underlying) a "provisional" class certification. The Court observes, however, that in requesting "provisional" class certification, Plaintiffs noted:

> Because "the certification of a class is always provisional" until final judgment, the term "provisional" is formally "redundant." Courts typically label class certification granted alongside preliminary relief "provisional" to indicate openness to revising class issues later in litigation if warranted.

(Doc. No. 7 at 15 n.4 (citations omitted)). That is all to say that Plaintiffs' sought-after class certification (i.e., "provisional" certification) is in practice and effect no different from class certification as that term is regularly understood; on the other hand, the Court's acceptance of the characterization of the class certification as being merely "provisional" does serve the useful purpose of conveying that the Court is open to revisiting class certification later in the litigation as the record is developed more fulsomely.

Supporting the Class Certification Response is an exhibit (Doc. No. 28)[10] that is filed under seal and is composed of discovery responses from *Lucy I* and excerpts of transcripts of depositions taken in *Lucy I*. Plaintiffs have filed a reply (Doc. No. 36, "Class Certification Reply") in further support of the Class Certification Motion. Supporting the Class Certification Reply is an exhibit (Doc. No. 37-1) composed of discovery responses from *Lucy I*, (whole, rather than excerpts of) transcripts of depositions taken in *Lucy I*,[11] and various court orders and federal immigration documents that detail Plaintiffs' respective immigration statuses.[12]

The third motion is "Plaintiffs' Unopposed Motion for Leave to Proceed Pseudonymously and Memorandum of Law in Support" (Doc. No. 8, "Pseudonym Motion"), wherein Plaintiffs "seek leave to proceed pseudonymously, under the following [respective] pseudonyms: Lucy and Benjamin." (Doc. No. 8 at 2).

For the reasons described herein, the Preliminary Injunction Motion (Doc. No. 6) will be **DENIED**, decision on the Class Certification Motion (Doc. No. 7) will be **DEFERRED**, and the Pseudonym Motion (Doc. No. 8) will be **GRANTED**.[13]

---

[10] Defendants have sought leave to maintain the exhibit at Docket No. 28 under seal, via a motion at Docket No. 27 ("Second Motion to Seal"). Like the First Motion to Seal, the Second Motion to Seal will be resolved via a separate order.

Of note, Defendants also filed, at Docket No. 29-1, an ostensible exhibit to the Class Certification Response that actually serves as a mere placeholder that refers to the sealed exhibit at Docket No. 28.

[11] The discovery responses and transcripts of depositions from *Lucy I* filed by Plaintiffs at Docket No. 37-1 overlap in content with the discovery responses and transcripts of depositions from *Lucy I* filed by Defendants at Docket No. 28. With that said, the discovery responses and transcripts of depositions from *Lucy I* filed by Plaintiffs and Defendants are not identical, and the discovery responses and transcripts of depositions filed by Plaintiffs generally are more fulsome (i.e., more complete) than those filed by Defendants.

[12] The exhibit at Docket No. 37-1 is redacted in part. Plaintiffs have filed under seal at Docket No. 38 an unredacted version of the exhibit at Docket No. 37-1 and have also sought leave via a motion (Doc. No. 37, "Third Motion to Seal") to maintain the filing at Docket No. 38 under seal. As with the First Motion to Seal and the Second Motion to Seal, the Court will address the Third Motion to Seal via a separate order.

[13] Defendants have also filed a motion to dismiss at Docket No. 41. The motion to dismiss remains pending.

## BACKGROUND[14]

Plaintiffs initiated this lawsuit by filing the complaint (Doc. No. 1, "Complaint") on July 17, 2026. In the Complaint, Plaintiffs bring a single claim, wherein they assert that Section 1 of H.B. 1704, a recently enacted Tennessee criminal statute, is preempted by federal law. (Doc. No. 1 at ¶¶ 67-70).[15] Below, the Court first reviews the parties to, and the circumstances underlying, this action and then reviews the challenged provision (Section 1) of H.B. 1704. The Court then briefly outlines the sequence in which it addresses the pending motions further below.

### 1. The Parties

Plaintiff Lucy is a 58-year-old foreign national who currently lives in Memphis, Tennessee. (Doc. No. 6-1 at ¶¶ 2-3). After entering the United States on a visitor's visa, she applied for asylum, and her application for asylum was subsequently denied and Lucy was issued a removal order. (*Id.*

[14] The following facts, unless somehow qualified herein (as for example by "Plaintiffs allege that" or "Defendants assert that"), are taken as true for purposes of the pending motions because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

The Court notes that when citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

[15] As Plaintiffs argue, and Defendants do not dispute, "Plaintiffs have a cause of action to sue under the longstanding equitable practice reflected in *Ex Parte Young*, 209 U.S. 123 (1908), which makes clear that plaintiffs threatened with [alleged federally] preempted prosecutions can sue in equity." (Doc. No. 6 at 13 n. 9). *See Smith v. Kentucky*, 571 F. Supp. 3d 735, 739 n.1 (W.D. KY 2021) ("*Ex Parte Young*[] recognized an equitable cause of action (of sorts) to enjoin constitutional violations."); *Foulks v. Ohio Dep't of Rehab. & Correction*, 713 F.2d 1229, 1231 (6th Cir. 1983) ("*In Ex parte Young*, the Court recognized an equitable cause of action against state officers [] for violations of constitutional rights." (citation omitted)); *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (U.S. June 29, 2026) ("We have often held that plaintiffs may sue 'in equity' without a congressionally-provided cause of action '"to prevent an injurious act by a public officer."'" (quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (quoting *Carroll v. Safford*, 3 How. 441, 463 (1845)))).

at ¶¶ 6-7). Lucy unsuccessfully appealed her removal order, as well as the denial of her asylum application, to the Board of Immigration Appeals and to the United States Court of Appeals for the Sixth Circuit. (*Id.* at ¶ 7). Lucy's appeals were denied in 2005. (*Id.*). Since then, she has not challenged her removal order, and "no court or agency has [] canceled or reopened it." (Doc. No. 6-3 at ¶ 2). Lucy's removal order has not been withdrawn and "is still in place today." (*Id.*). Because of Lucy's removal order, she is "under an order of supervision by federal immigration officials [and] must check in with officials monthly in Memphis." (*Id.* at ¶ 3). Lucy has now applied for asylum under the Violence Against Women Act, "which would provide [her] with lawful permanent residence." (Doc. No. 6-1 at ¶ 9; Doc. No. 6-3 at ¶ 5).[16] Lucy's application for asylum under the Violence Against Women Act remains pending. (Doc. No. 6-3 at ¶ 5). Lucy is "extremely worried that [she] will be arrested under H.B. 1704" because she believes that "the law applies to people like [her] who have a final removal order." (Doc. No. 6-1 at ¶ 10).

Lucy's sole co-plaintiff in this action, Plaintiff Benjamin, is a 35-year-old foreign national who currently lives in Memphis, Tennessee. (Doc. No. 6-2 at ¶¶ 2-3). Benjamin entered the United States "when [he] was very young." (*Id.* at ¶ 4). After coming to the United States, Benjamin's family "pursued asylum," but the family's asylum "application was denied," and Benjamin "was ordered removed." (*Id.* at ¶ 5). Benjamin's family told him that the appeals of the removal order and of the denial of the asylum application were unsuccessful. (Doc. No. 6-4 at ¶ 2). Since the appeals concluded, Benjamin has not challenged his removal order and "[n]o court or agency has [] canceled or reopened [his] removal order." (*Id.* at ¶ 3). Benjamin's removal order has not been

[16] In one of her declarations, Lucy states that she is "pursuing an application" for asylum under the Violence Against Women Act. (Doc. No. 6-1 at ¶ 9). Lucy's supplemental declaration at Docket No. 6-3 makes clear that Lucy in fact *submitted* an application for asylum under the Violence Against Women Act and that this application remains pending. (Doc. No. 6-3 at ¶ 5 ("My [Violence Against Women Act] application is still pending.").

withdrawn and "is still in place today." (*Id.*). Because of his removal order, Benjamin "was placed on an order of supervision and had to check in with federal officials." (*Id.* at ¶ 4). Benjamin then applied for the Deferred Action for Childhood Arrival program ("DACA") and "was granted [relief under] DACA, [whereafter] the federal immigration official [he] checked in with congratulated [him] and told [him he] did not have to check in any more." (Doc. No. 6-2 at ¶ 6). Benjamin is "very worried that [he is] going to be arrested, put in jail, and convicted under H.B. 1704" because he has read that the "law applies to people like [him] who have a final removal order and continue to live in Tennessee." (Doc. No. 6-2 at ¶ 8).

There are fourteen defendants in this action. One defendant, General Skrmetti, is the Attorney General and Reporter of the State of Tennessee. (Doc. No. 1 at ¶ 16). Another defendant, Long, is the Commissioner of Safety and Homeland Security for the State of Tennessee. (*Id.* at ¶ 17). Each of the remaining twelve defendants—namely Allen, Johnson, Dunaway, Lawson, Funk, Edmonson, Crouch, Thompson, Davidson, Pickens, Agee, and Mulroy—is a state district attorney general for a particular Tennessee district.[17] (*Id.* at ¶¶ 18-29)

**2. Section 1 of H.B. 1704**

As noted above, the Complaint challenges Section 1 of H.B. 1704. H.B. 1704 was signed into law on April 21, 2026. 2026 Tenn. Pub. Acts, ch. 771, https://legiscan.com/TN/text/HB1704/2025. Section 1 of H.B. 1704 went into effect on July 1, 2026. H.B. 1704, § 3(b).[18] In relevant part, H.B. 1704 provides:

[17] From the Complaint, it appears that these particular Tennessee district attorneys general were named as defendants because they represent counties "Plaintiffs plan to pass through on their travels." (Doc. No. 1 at ¶ 30).

[18] H.B. 1704 has been codified in Tennessee Code Annotated, Title 39, Chapter 17, Part 1. However, for ease of references all citations of H.B. 1704 herein are made to H.B. 1704 itself, rather than to Tennessee Code Annotated.

> SECTION 1. Tennessee Code Annotated, Title 39, Chapter 17, Part 1, is amended by adding the following new section:
>
> > (a) A person who is eighteen (18) years of age or older commits an offense who:
> >
> > > (1) Is an alien against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a); and
> > >
> > > (2) Intentionally fails or refuses to depart from this state within a period of ninety (90) days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court.
> >
> > (b) A violation of subsection (a) is a Class A misdemeanor.
> >
> > (c) If the person has not exhausted all available paths under federal law for challenging the final order of removal, then the court shall grant a stay of the criminal proceedings until the person has exhausted all available paths under federal law for challenging the final order of removal.

H.B. 1704, § 1.[19] In other words Section 1 of H.B. 1704 requires that "an alien"[20] who is eighteen years of age or older, "against whom a valid final order of removal is outstanding by reason of

---

[19] Section 2 of H.B. 1704 makes it a crime in certain circumstances for an alien "that has been denied admission, excluded, deported, or removed from the United States or has departed the United States while an order of exclusion, deportation, or removal is outstanding" to enter or attempt to enter Tennessee. H.B. 1704 § 2. Section 2 of H.B. 1704 is not at issue in this lawsuit, and Section 2 of H.B. 1704 has not yet gone into effect. H.B. 1704 specifically provides that Section 2 of H.B. 1704 will go into effect only upon (1) the issuance of the judgment in any decision of the United States Supreme Court overruling, in whole or in part, *Arizona v. United States*, 567 U.S. 387 (2012), whereupon states would be authorized to determine that a person is unlawfully present in a state; or (2) the adoption of a federal statutory provision that, in whole or in part, removes the preemption of states' ability to determine that a person is unlawfully present in a state. H.B. 1704 § 3(a).

H.B. 1704 mentions *Arizona v. United States* only in connection with Section 2, and not Section 1. That is, the effective date of Section 2 of H.B. 1704 is essentially deferred until such time as *Arizona v. United States* is overruled in relevant part, but the same is not true for Section 1 of H.B. 1704, which went into effect on July 1, 2026. But that is not to say that *Arizona v. United States* is irrelevant to whether Section 1 of H.B. 1704 is preempted by the federal immigration statutory scheme, either via conflict or field preemption. In any event, the relevance (if any) on that question is a merits-based issue that the Court ultimately does not address herein.

[20] H.B. 1704 does not define the term "alien[s]." The term, though, has a relatively consistent (and non-derogatory) definition across the various legal contexts in which it is used. For purposes of federal

being a member of any of the classes described in 8 U.S.C. § 1227(a),"[21] neither fail to nor refuse to depart the state of Tennessee within "ninety (90) days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court," or else that alien will commit a Class A misdemeanor and thus be subject to criminal penalties. H.B. 1704, § 1. As noted above, Plaintiffs assert in the Complaint that Section 1 of H.B. 1704 is preempted by federal immigration law.

**3. The Motions**

As previously stated, there are three motions that the Court will address herein: the Preliminary Injunction Motion (Doc. No. 6), the Class Certification Motion (Doc. No. 7), and the Pseudonym Motion (Doc. No. 8). The Court begins by reviewing the Preliminary Injunction Motion.

## DISCUSSION

**1. The Preliminary Injunction Motion**

Turning to the Preliminary Injunction Motion, the Court will first examine the legal standard governing the issuance of preliminary injunctions. The Court will then analyze whether Plaintiffs have sufficiently established standing so as to be granted preliminary injunctive relief;

---

immigration law, the definition is clear enough. *See, e.g.*, 8 U.S.C. § 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United States."); 8 U.S.C.A. § 1101(a)(22) ("The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."). Setting aside the issue of who "owes permanent allegiance" to the United States despite not being a citizen of the United States—a question as to which there appears to be a relatively clear answer, albeit one into which the Court need not delve herein—the definition is, as just noted, clear. H.B. 1704 does not expressly incorporate the above-referenced federal statutory definition, though it is not hard to conclude that such definition should apply to the term "alien" as used in H.B. 1704. In any event, it appears undisputed that each of the Plaintiffs is an "alien," and indeed Plaintiffs' claim to have standing seems premised in pertinent part on the fact that they are "aliens" for purposes of H.B. 1704.

[21] H.B. 1704 does not define the terms "valid," "final," or "outstanding." But as discussed below, it appears undisputed that each Plaintiff is subject to a removal order that is valid, final, and outstanding.

in so doing, the Court will conduct a review of both standing generally and certain unique elements required to establish standing in the context of a pre-enforcement challenge (such as the one here at issue) in particular. Because the Court below concludes that Plaintiffs have not sufficiently established standing as required for the issuance of a preliminary injunction, the Court herein does not ultimately analyze any of the (below-referenced) four requirements for the issuance of a preliminary injunction—i.e., a likelihood of success on the merits, irreparable harm in the absence of the injunction, the balance of equities, and the public interest—beyond merely noting that, as discussed below, a plaintiff (like Plaintiff here) that does not show a likelihood of establishing standing necessarily fails to show a likelihood of success on the merits.

a. Preliminary Injunction Legal Standard

As just indicated, those seeking a preliminary injunction must meet four requirements.[22] They must show a likelihood of success on the merits; irreparable harm in the absence of the

[22] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm and some level of likelihood of success on the merits are requirements (and, if these two requirements are satisfied and thus keep the possibility of a preliminary injunction alive, thereafter become factors to be balanced along with the other two factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). Indeed, just recently the Sixth Circuit stated:

> [O]ur current standard is clear: "[t]he preliminary injunction factors do not represent a list of 'prerequisites to be met,' " and only when a movant utterly fails to satisfy one of the first two factors—likelihood of success on the merits or irreparable harm—can we say that the preliminary injunction is unwarranted without consideration of the other factors or without balancing of the four in light of one another. [*PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026) (citation omitted)].

*NetChoice, LLC v. Skrmetti*, No. 25-5660, 2026 WL 2546423, at *4 (6th Cir. Aug. 28, 2026). Compared to irreparable harm, likelihood of success on the merits is less clearly an *absolute* requirement under the factor-based approach, but at the very least it seems clear that "[a] finding that there is simply no likelihood of success on the merits is *usually* fatal." *Gonzales v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (emphasis added).

Alas, the Court must respectfully disagree that it is currently clear that the Sixth Circuit standard for the issuance of a preliminary injunction is factor-based rather than requirement-based. The unfortunate reality, which apparently was overlooked in *NetChoice*, is that the Sixth Circuit case law referring to these items as factors is inconsistent with other Sixth Circuit case law and with Supreme Court cases (including *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)) that describe these items as all being requirements (i.e., things that each must be established), and the undersigned observes that the current standard in the Sixth Circuit as to whether these four items are requirements only or are factors is thus *not at all clear*. Indeed, numerous Sixth Circuit cases stand for the proposition that all four items *must* be established—thus plainly rendering all of these items *requirements* rather than *factors. See e.g., Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 535-36 (6th Cir. 2020) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter*, 555 U.S. at 20))); *Obama for Am.*, 697 F.3d at 428 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." (quoting *Winter*, 555 U.S. at 20)); *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508 (6th Cir. 2025) ("To qualify [for a preliminary injunction], a plaintiff must 'establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest.'" (quoting *Winter*, 555 U.S. at 20)). Indeed, in one recent opinion, the Sixth Circuit explicitly noted that these four items are *requirements*:

> Those seeking a preliminary injunction must meet several requirements. They must show a likelihood of success on the merits. They must show irreparable harm in the absence of the injunction. They must show that the balance of equities favors them. And they must show that the public interest favors an injunction.

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022) (citing *Winter*, 555 U.S. at 20). *See also FemHealth USA, Inc. v. Williams*, 83 F.4th 551, 563 (6th Cir. 2023) (Bush, J., concurring in part and dissenting in part) ("For good reason there are well-established requirements that a party must meet to obtain a preliminary injunction. These, of course, relate to likelihood of success on the merits, irreparable harm, balance of harms, and the public interest."). Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Preliminary Injunction Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and "usually" likelihood of success (at least to some minimal extent) is also required. *D.T.*, 942 F.3d at 326–27 ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs.*, 860 F.3d at 849 (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits" (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))); *Gonzales*, 225 F.3d at 625 ("a finding that there is simply no likelihood of success on the merits is usually fatal").

Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing"

injunction; that the balance of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction *must* establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (emphasis added)); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022) (referring to the "several requirements" that must be met for a preliminary injunction to issue).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *McNeilly*, 684 F.3d at 614 (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating

---

of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the *issue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or by referring to the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein.

preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead relied on mere allegations); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. 1996) (affirming denial of a preliminary injunction where the district court relied on a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice."), *report and recommendation adopted*, 2008 WL 2095387 (W.D. Mich. May 15, 2008). The decision whether to grant a preliminary injunction is a matter within the discretion of the district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

b. <u>Analysis of the Preliminary Injunction Motion</u>

Because Defendants have raised, in the Preliminary Injunction Response (and, for that matter, also in the Class Certification Response), purported deficiencies with respect to Plaintiffs' standing, the Court will begin its analysis of the Preliminary Injunction Motion with an examination of standing, starting with how standing relates to the likelihood of success on the merits requirement for a preliminary injunction.

*i. Standing and Likelihood of Success on the Merits*

Standing is relevant to the likelihood-of-success-on-the-merits requirement for a preliminary injunction. *See Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 509 (6th Cir. 2025) ("[S]tanding analysis, though not an inquiry into a claim's merits, is still 'relevant to [the] likelihood of success [on the merits]' inquiry" (quoting *Arizona v. Biden*, 40 F.4th 375, 383 (6th. Cir. 2022))). This only makes sense; after all, if a plaintiff lacks standing to bring a claim (and thus a federal court lacks subject-matter jurisdiction over that

claim),[23] then it necessarily follows that a plaintiff would not have a likelihood of success on the merits (or even a likelihood of *having a court reach* the merits) of that claim. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) ("an 'affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [the] plaintiff has standing.'" (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring in part))).

Given the relevance here of standing, the Court next will provide a review of standing principles, with a particular focus on standing in the context of a pre-enforcement challenge such as the one that Plaintiffs present.

*ii. Standing Generally*

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing is a core component of this "case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The requirement of standing "ensure[s] that federal courts do not exceed their authority," by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). In other words, standing is a jurisdictional requirement—and in particular a requirement for a federal court to exercise subject-matter jurisdiction over a particular action.[24] *See Coal Operators &*

---

[23] "Standing is a jurisdictional requirement. If no plaintiff has standing, then the court lacks subject-matter jurisdiction." *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) (citations omitted).

[24] The more precise description of the law here would be to say that standing is a requirement for a federal court to exercise subject-matter jurisdiction over a particular *claim*. This is because standing must be established with respect to each claim that each plaintiff brings, so that if a plaintiff lacks standing as to a particular claim, the court lacks subject-matter jurisdiction over that claim (at least to the extent that that

*Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002). Thus, if no plaintiff has standing, the court entirely lacks subject-matter jurisdiction. *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Importantly, standing is both plaintiff-specific and claim-specific. That is to say, and consistent with the Court's discussion in an earlier footnote, "*each* plaintiff 'must demonstrate standing for *each* claim that [she] presses . . . .'" *Moms for Liberty*, 155 F.4th at 509 (emphasis added) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). In other words, the Court potentially[25] can exercise subject-matter jurisdiction only as to *each* plaintiff and *each* claim as to which standing has been established.

"[A]s the party invoking federal jurisdiction," a plaintiff has the burden of establishing standing by demonstrating that she: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[26] *Spokeo*, 578 U.S. at 338 (citations omitted). A plaintiff "*must* satisfy" this "three-part

plaintiff (as opposed to any other plaintiff who brought the claim)) even if it has subject-matter jurisdiction over other claims of that plaintiff (and thus can exercise jurisdiction over the action with respect to *those* claims). *See Moms for Liberty,* 155 F.4th at 509 ("At the preliminary injunction stage, then, [each] plaintiff must make a clear showing [through evidence] that she is likely to establish each element of standing. And because standing is not dispensed in gross, each plaintiff must demonstrate standing for each claim that [she] presses . . . ." (citations and internal quotation marks omitted) (brackets in original)). But in the instant case, there is only one claim, and so if one of the Plaintiffs (i.e., Lucy or Benjamin) has standing as to a *claim* (i.e., *the* claim), then that plaintiff has standing as to the entire *action*, and the Court thus has subject-matter jurisdiction over the entire action as to *that* plaintiff. For these reasons, the Court herein generally speaks in terms of standing and subject-matter jurisdiction as to an *action* and not just a *claim*. But as noted elsewhere herein, and consistent with the Court's next-to-last sentence in this footnote, standing as to an action must be established both on a plaintiff-by-plaintiff and a claim-by-claim basis.

[25] The Court here says "potentially" because subject-matter jurisdiction could be lacking in a given context even where standing exists as to the plaintiff and claim involved.

[26] Often "the questions of causation and redressability overlap." *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007) (Roberts, J., dissenting). Indeed, as the Sixth Circuit has noted, "[c]ausation and redressability are related elements of standing that frequently have been treated as one." *Kardules v. City of Columbus*, 95 F.3d 1335, 1352 (6th Cir. 1996). Thus, usually, "if a plaintiff can demonstrate that his injuries were caused by the defendant, the courts are in a position to redress the situation." *Id.* On the other hand, "the Supreme Court has treated these two requirements separately." *Id.* The upshot is that the Court must and does

test for each injury that they allege, for each defendant that they sue, and for each remedy that they seek." *Bowles v. Whitmer*, 120 F.4th 1304, 1310 (6th Cir. 2024) (emphasis added) (citing *Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023)); *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022)). The plaintiff "bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020).[27]

---

recognize that the requirements are legally and conceptually distinct yet tend to go together in practical application.

[27] The Sixth Circuit observed five years ago that although "it is widely accepted that a plaintiff must establish standing at the time the lawsuit commences, it is perhaps less clear whether the standing requirement persists." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 557 (6th Cir. 2021). The Sixth Circuit specifically noted:

> Recently, the Supreme Court has implied that in certain cases a plaintiff may have to maintain standing throughout the lawsuit. *See Trump v. New York*, [592] U.S. [125], 141 S. Ct. 530, 536–37, 208 L.Ed.2d 365 (2020) (per curiam) (dismissing a case for lack of both standing and ripeness after the plaintiffs' basis for standing disappeared during the pendency of the action); *Carney v. Adams*, [592] U.S. [53], 141 S. Ct. 493, 499, 208 L.Ed.2d 305 (2020) (noting that the plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter"). The Supreme Court, however, has not explicitly overruled past precedent that confined the standing inquiry to the moment when the lawsuit was filed. *See, e.g., Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L.Ed.2d 737 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). We need not resolve this tension here, however, because mootness poses another Article III jurisdictional bar to plaintiffs' claim. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67, 117 S. Ct. 1055, 137 L.Ed.2d 170 (1997) ("We may resolve the question whether there remains a live case or controversy ... without first determining whether [plaintiffs have] standing to appeal because the former question, like the latter, goes to the Article III jurisdiction of this Court and the courts below, not the merits of the case."); *In re: 2016 Primary Election*, 836 F.3d 584, (6th Cir. 2016) (recognizing that this court has "discretion to address jurisdictional issues 'in any sequence we wish' " (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc))).

*Id.* This observation is well-taken, and indeed some case law, both from the Supreme Court and the Sixth Circuit, suggests that the standing requirement does not persist past the commencement of the lawsuit. *See e.g., Davis*, 554 U.S. at 734 ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *Friends of the Earth Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 170 (2000) (suggesting that standing is assessed "at the time the action commences."); *Cleveland Branch, N.A.A.C.P., v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) ("standing does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed."). With that said, it appears to the undersigned that the question of whether standing must be maintained beyond the time that a lawsuit is

At the preliminary injunction stage, a "plaintiff must make a 'clear showing' that she is 'likely' to establish each of the three elements of standing" in order for a preliminary injunction to issue. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Moms for Liberty*, 155 F.4th at 509.[28] Importantly,

---

commenced has now been (and arguably had been even prior to the decision in *Memphis A. Philip Randolph Inst.*) definitively answered by the Supreme Court in the affirmative—i.e., a plaintiff must have standing at the time that the lawsuit was *filed* and *maintain* standing thereafter. *See, e.g., Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (standing requirements "persist throughout all stages of litigation"); *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016) ("The need to satisfy [the] three [standing] requirements persists throughout the life of the lawsuit."); *Carney*, 592 U.S. at 59 (a plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter. "); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (The plaintiff "bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." (quoting *Carney*, 592 U.S. at 58)). That is all to say, the undersigned discerns that each plaintiff must establish standing when an action is *commenced* and maintain standing *thereafter*, and the Court will proceed accordingly herein.

Importantly, this is not to say that the disappearance of standing for a plaintiff means that the plaintiff's case has become *moot*. The Court is aware that standing and mootness are not synonyms. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190-91 (2000). For example, one important difference between standing and mootness is that whereas the plaintiff bears the burden of showing standing, "the burden to defeat jurisdiction with a mootness objection rests on the party asserting mootness [typically, the defendant]." *Kentucky v. Yellen*, 54 F.4th 325, 340 n.10 (6th Cir. 2022). Furthermore, and related to the above discussion, the Court discerns that a plaintiff can lose *standing* to maintain a suit even though the suit is not properly characterized as becoming *moot*. In fact, in *Trump v. New York*, the Supreme Court appears to have found that standing disappeared mid-case without the case necessarily becoming moot. 592 U.S. at 131-134. In that case, the Supreme Court treated standing as disappearing (as opposed treating the case as becoming moot, a concept that went unmentioned in the opinion) when the "chill"—i.e., the injury—from a challenged government memorandum "dissipated" during the course of the lawsuit. 592 U.S. at 131. The Supreme Court then dismissed the case based, in part, on lack of standing. *Id.* at 134.

With all that said, the Court wishes to note one more thing regarding standing. Although the proposition that a plaintiff must *maintain* standing throughout a lawsuit necessarily implies that events taking place *after* the commencement of an action could *destroy* standing, that does not mean that events taking place *after* the commencement of an action can somehow serve to establish standing *if* there was no standing at the commencement of an action; rather, a lack of standing at the commencement of the action is fatal, even if subsequent events would have served to support a finding of standing had the case been filed after those events. *See Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024) (rejecting attempt by plaintiffs to assert "additional facts regarding enforcement actions that occurred after each [] complaint was filed" in an apparent effort to "retroactively generate standing."); *Fox v. Saginaw Cnty.*, 67 F.4th 284, 295 (6th Cir. 2023) ("a plaintiff who lacks standing from the start cannot rely on factual changes during the suit to establish it"). The Court will herein keep this principle in mind also.

[28] Of note, the Court discerns that for the purposes of seeking a preliminary injunction, a plaintiff asserting numerous injuries may be able to make a clear showing that they are likely to establish the first requirement of standing—i.e., an injury-in-fact—by making a clear showing that he or she is likely suffering just *one asserted injury*. *Cf. Caspar v. Snyder*, 77 F. Supp. 3d 616, 636 (E.D. Mich. 2015) ("Because there is standing for at least some of the claimed harms, it is irrelevant whether other harms, standing alone, would

and consistent with the Court's observations earlier, at the preliminary injunction stage the plaintiff(s) must make a clear showing as to the three elements of standing through *evidence*, and to do so a plaintiff may not merely rely on allegations in the pleadings. *See Moms for Liberty*, 155 F.4th at 509 (noting that to obtain a preliminary injunction, a "plaintiff must make a 'clear showing' through *evidence* that she is 'likely' to establish each element of standing" (cleaned up) (emphasis added)).[29]

Given that the parties' arguments as to standing focus in large part on whether Plaintiffs have adequately shown[30] as required that they will suffer an injury-in-fact, the Court here provides

---

not support standing." (citing *Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ*, 584 F.3d 253, 261 (6th Cir.2009))).

[29] Notably, a plaintiff's burden to establish standing for the purposes of seeking a preliminary injunction is a different burden than a plaintiff's burden to establish standing at the pleading stage for purposes of surviving a motion to dismiss for lack of standing. For context, the Court will briefly review the legal standard that governs the *dismissal* (on motion) of a complaint for lack of standing.

Standing is "an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)," and motions to dismiss for lack of standing are made under Rule 12(b)(1). *Lyshe*, 854 F.3d at 857. *See also Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Allstate Ins. Co. v. Global Medical Billing, Inc.*, 520 F. App'x 409, 410-11 (6th Cir. 2013). A challenge to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *See Kale v. Procollect, Inc.*, 547 F. Supp. 3d 793, 796 (W.D. Tenn. 2021) ("Challenges to standing can be facial or factual."); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack."). "A facial attack on standing challenges the legal sufficiency of the complaint, whereas a factual challenge against standing questions whether the complaint's factual assertions reflect reality." *Shumway v. Neil Hosp., Inc.*, 570 F. Supp. 3d 585, 588 (W.D. Tenn.) (citing *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). "When there is a facial challenge to standing, the court must regard all [factual] allegations in the complaint as true." *Id.* And so, "[w]hen analyzing a facial attack, the court must accept the plaintiff's [factual] allegations regarding standing as true and determine whether the plaintiff has asserted a plausible claim that it has standing." *Ctr. for Biological Diversity v. Tennessee Valley Auth.*, No. 3:21-CV-319-TAV-DCP, 2022 WL 4137824, at *2 (E.D. Tenn. Sept. 12, 2022). However, when a court considers a factual attack on a complaint, "no presumptive truthfulness applies to the factual allegations." *Ohio Nat. Life Ins.*, 922 F.2d at 325. Instead, "the district court must [] weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist[] [and] a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.*

[30] Here, and elsewhere, the Court will refer to Plaintiffs being required to "show" or "sufficiently show" something in the context of establishing standing for the purposes of a preliminary injunction issuing. This terminology is shorthand for the burden that Plaintiffs must meet in order to establish standing for the purposes of a preliminary injunction issuing—namely that Plaintiffs must make a clear showing through

an overview of the concept of injury-in-fact, both generally and specifically as it relates to a pre-enforcement action seeking to challenge the application of a statute. An alleged injury amounts to (the required) injury-in-fact "only if it is 'actual or imminent, not "conjectural" or "hypothetical."''" *Christian Healthcare Centers, Inc. v. Nessel*, 117 F. 4th 826, 842 (6th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). In an action where a plaintiff challenges a particular statute or policy before it has been enforced against the plaintiff—i.e., a pre-enforcement action such as the instant action—a "difficult" and "'recurring issue' is 'determining when the threatened enforcement of a law creates an Article III injury.'" *Christian Healthcare*, 117 F.4th at 843 (quoting *Driehaus*, 573 U.S. at 158). In *Crawford v. United States Department of the Treasury*, 868 F.3d 438 (6th Cir. 2017), the Sixth Circuit explained what is required to establish an Article III injury[31] in a pre-enforcement action. The Sixth Circuit court wrote (on appeal of a district court's dismissal of a case, as opposed to a denial of a preliminary injunction, for lack of standing):

> In a pre-enforcement challenge to a federal statute, the Supreme Court has held that a plaintiff satisfies the injury requirement of standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, [573] U.S. [149], 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979)); *see also Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975)[].
>
> The mere *possibility* of prosecution, however—no matter how strong the plaintiff's intent to engage in forbidden conduct may be—does not amount to a "credible threat" of prosecution. Instead, the threat of prosecution "must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (quoting *Whitmore*, 495 U.S. at

---

evidence that they are likely to establish each of the three elements of standing. By using the terms (sufficiently) "show" or (sufficiently) "shown" the Court does not mean to suggest that Plaintiffs must *conclusively* show or establish anything at this stage of the litigation. The required "showing" is one of likelihood, not certainty.

[31] Herein, the terms "Article III injury" and "injury-in-fact" are used interchangeably.

> 158, 110 S. Ct. 1717). Putting the Supreme Court's language in *Warth, Driehaus*, and *Clapper* together: to have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct.

*Crawford*, 868 F.3d at 454-55. The upshot is that to establish an injury-in-fact in the context of a pre-enforcement challenge to a statute, a plaintiff must show three things: "(1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Christian Healthcare*, 117 F.4th at 843 (quoting *Driehaus*, 573 U.S. at 159).[32]As just indicated, with respect to the third and final of these requirements for injury-

[32] The Sixth Circuit has not always been consistent in the terms that it uses to elucidate this three-part test for finding injury-in-fact in the context of a pre-enforcement suit. Indeed, in 2024, the Sixth Circuit elucidated this three-part test in the following—somewhat different—terms:

> Thus, we have permitted *pre*-enforcement review, but only when the plaintiff (1) "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest,' " (2) that the challenged statute proscribes, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L.Ed.2d 246 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979)), and (3) the plaintiff's intention generates a "*certainly impending*" threat of prosecution, *Crawford*, 868 F.3d at 454 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L.Ed.2d 264 (2013)).

*Friends of George's Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024). Notably, there is some inconsistency in the language that the Sixth Circuit has used for the third requirement of the test for showing an injury-in-fact in a pre-enforcement suit context. Sometimes the Sixth Circuit has referred to this requirement in terms of a plaintiff being required to show a "*certainly impending*" threat of prosecution or enforcement against the plaintiff, *Friends of George's*, 108 F.4th at 435, and sometimes the Sixth Circuit has referred to this requirement in terms of a plaintiff being required to show that there is a *credible threat* of enforcement against the plaintiff. *Christian Healthcare*, 117 F.4th at 843.

In the Court's view, the framing of the third requirement of the test for showing injury-in-fact in a pre-enforcement suit context is better understood as requiring a plaintiff to make out a *credible* threat of enforcement, rather than to show that there is a *certainly impending* threat of enforcement. The Court takes such a view not least because the Court is hard pressed to conceive of what a "certainly impending" threat of prosecution (as contrasted with, for example, a "threat of certain prosecution" or a "certain threat of prosecution") would even look like in practice. And so, herein the Court will discuss this third factor in terms of there being (or not being) a "credible threat" of enforcement.

in-fact, a plaintiff must demonstrate that there is a credible threat that the law will be enforced as to *that plaintiff*.[33] *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) ("A plaintiff asserting standing to challenge a law before it has been enforced against him must show a 'credible fear' that the state or its agents will in fact enforce the law *in his case*." (emphasis added)). It necessarily follows that it is simply insufficient to show that there is a credible threat the law will be enforced (to whatever extent) *generally* or a credible threat that the law will be enforced against particular *other* persons.

*iii. Application*

The Court next analyzes the parties' arguments as to standing. Defendants specifically assert that Plaintiffs have not made a clear showing that they are likely to suffer an injury-in-fact as required to sufficiently establish standing for a preliminary injunction to issue. Defendants also challenge the traceability of Plaintiffs' injury-in-fact—to the extent Plaintiffs *do* have an injury-in-fact—to General Skrmetti in particular.

As noted just above, to establish an injury-in-fact in a pre-enforcement action, a plaintiff must show three things: (1) that she has "an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Christian Healthcare*, 117 F.4th at 843.

There is little dispute that Plaintiffs have satisfied the first and second requirements for injury-in-fact in this context—i.e., that Plaintiffs have an intent to engage in a course of conduct

[33] At times, the Court will refer to the third of these requirements for injury-in-fact in terms of a "credible threat of enforcement" without the qualifier that the "credible threat of enforcement" must be to a particular plaintiff (i.e., here, a particular one of the Plaintiffs).When the Court does so, it does so with the understanding that the "credible threat of enforcement" must be to a particular plaintiff in order for that plaintiff to have standing.

arguably affected with a constitutional interest[34] and that this conduct is arguably proscribed by the statutory provision at issue, namely Section 1 of H.B. 1704.[35] The parties' dispute concerns whether Plaintiffs have shown that there is a credible threat of enforcement of Section 1 of H.B. 1704.

In considering whether there is a credible threat of enforcement in a pre-enforcement suit context, courts in the Sixth Circuit consider four factors: (1) "a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," (3) "an attribute of the challenged statute that makes enforcement easier or more

---

[34] The Sixth Circuit has held that in preemption challenges like this one, conduct is "affected with a constitutional interest by virtue of [the] federal preemption claim, which is 'basically constitutional in nature' because it 'deriv[es] its force from the operation of the Supremacy Clause.'" *McKee Foods Corp., v. BFP Inc.*, 173 F.4th 242, 258 (6th Cir. 2026) (quoting *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 271-72 (1977)). No party disputes that Plaintiffs' conduct in this action is affected with a constitutional interest.

[35] As a reminder, Section 1 of H.B. 1704 applies to (and only to) "an alien" who is eighteen years of age or older, "against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a)"; for such persons (and only for such persons), it proscribes failing or refusing to leave the state of Tennessee within "ninety (90) days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court" ("90-day window") or else that alien will be subject to criminal penalties—namely a Class A misdemeanor.

With respect to the requirement that Plaintiffs engage in (or have an intent to engage in) conduct that is arguably proscribed by Section 1 of H.B. 1704, the parties do not dispute that Plaintiffs are aliens who are eighteen years of age or older, that Plaintiffs are subject to valid, final, and outstanding orders of removal, and that Plaintiffs have failed (or refused) to leave the state of Tennessee within the 90-day window. In the Class Certification Response (Doc. No. 29), Defendants appear to suggest that Plaintiffs—although subject to valid, final and outstanding orders of removal—may not be members of any class described in 8 U.S.C § 1227(a) so that (according to Defendants) Plaintiffs might not be subject to removal orders specifically "by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a)." (Doc. No. 29 at 9-10). However, the record in this case confirms that Plaintiffs were ordered removed under 8 U.S.C. § 1227(a)(1)(B). (Doc. No. 6-5 at 8-9, 18 (Plaintiffs' removal order finding Plaintiffs removable under 8 U.S.C. § 1227(a)(1)(B))).

So, Plaintiffs have shown that they have engaged (or have an intent to engage) in conduct arguably proscribed by Section 1 of H.B. 1704 because Plaintiffs have shown that each of them is an "alien," who is eighteen years of age or older, "against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a)," and who have failed (or refused) to leave the state of Tennessee within the 90-day window. H.B. 1704, § 1.

likely, such as a provision allowing any member of the public to initiate an enforcement action," and (4) whether the defendant has refused to "disavow enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016).[36] These "factors are not exhaustive, nor must each be established."[37] *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021), *abrogated on other grounds as recognized by Tenn. Conf. of NAACP v. Goins*, 139 F.4th 557, 563 (6th Cir. 2025). *See also Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) ("A plaintiff need not satisfy all the *McKay* factors to establish a credible threat"). The Sixth Circuit has stated that at "bottom, [the] inquiry distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Christian Healthcare*, 117 F.4th at 848 (quoting *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022)).[38] The Court's firm belief is that in many cases, reasonable jurists could disagree as to the (case-specific) answer to that question because there is some subjectivity in the concept of "credible threat." The best the Court can do—and what it will do here—is call it like it sees it based on what it believes is a sound construction of the term "credible threat" coupled with a sound application of the *McKay* factors.

---

[36] Courts sometimes refer to these factors collectively as the *McKay* factors, and the Court herein will do likewise.

[37] This last proposition makes perfect sense; if all of the factors had to be established by the plaintiff, they would not be factors at all, but rather *requirements* for the plaintiff.

[38] The Sixth Circuit appears to use the terminology of a "credible threat of enforcement" and a "credible fear of enforcement" interchangeably. *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1023-24 (6th Cir. 2024); *Online Merchs. Guild*, 995 F.3d at 550-51; *Christian Healthcare*, 117 F.4th at 851. Herein, for the sake of terminological consistency the Court will use the term "credible threat of enforcement' in its analysis, except when it is quoting directly (or discussing in context) case law or briefing on the Preliminary Injunction Motion where the terminology "credible fear of enforcement" is utilized.

Turning to the first factor—the history of past enforcement against Plaintiffs or others, *McKay*, 923 F.3d at 869[39]—this Court has observed that the "threat of enforcement is particularly credible when 'the same conduct has drawn enforcement actions or threats of enforcement in the past.'" *Welty v. Dunaway*, 791 F. Supp. 3d 818, 834 (M.D. Tenn. 2025) (hereinafter, "*Welty II*") (quoting *Kiser*, 765 F.3d at 609)). *See also Driehaus*, 573 U.S. at 164 (noting that "past enforcement against the same conduct is good evidence that the threat of enforcement" is credible). A "lack of enforcement history, however, does not automatically defeat [by virtue of a purported lack of standing] pre-enforcement review," and the "Sixth Circuit has discounted this factor when there was a plausible explanation for the lack of enforcement history." *Welty II*, 791 F. Supp. 3d at 834. *See also Christian Healthcare*, 117 F.4th at 849 ("to establish standing, a plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake."). For instance, in *Online Merchants Guild*, the Sixth Circuit found that a lack of enforcement history carried "little weight" where the challenged law (which was challenged during a declared emergency) was "enforceable only during a declared emergency."[40] 995 F.3d at 550. And the Sixth Circuit observed in *Christian Healthcare*—a case involving at least *some* (albeit limited) indication that a particular statute was in fact being enforced—that "given the short

[39] As noted above, a plaintiff must demonstrate that there is a credible threat that a challenged law will be enforced as to *that particular plaintiff*, and that it necessarily follows that it is simply insufficient to show that there is a credible threat the law will be enforced (to whatever extent) *generally* or a credible threat that the law will be enforced against particular *other* persons. The Court does not discern that its observations that a plaintiff in an action must show that there is a credible threat that the law will be enforced against *that plaintiff* are somehow undercut by the Court examining—as it is called upon to do by *McKay*— whether Section 1 of H.B. 1704 has been enforced against individuals other than Plaintiffs. The inquiry as to enforcement history—even if focused on past enforcement of Section 1 of H.B. 1704 against individuals who are not Plaintiffs (i.e., individuals other than Lucy and Benjamin)—naturally informs the inquiry of whether Section 1 of H.B. 1704 will be enforced against Plaintiffs.

[40] In *Online Merchants Guild*, it appears that a "declared emergency" (i.e., the trigger for the applicability of the statute at issue) was recognized in an "emergency order" that "was in place at all relevant times." 995 at 545, 545 n.2.

duration of the [statute's] application to [the conduct at issue], 'it makes sense that there would be at best limited evidence of a history of enforcement' [as to that conduct]." 117 F.4th at 849-850 (quoting *Online Merchs. Guild*, 995 F.3d at 550). *See also AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *9 (M.D. Tenn. June 30, 2025) ("Here, the history of past enforcement—or lack thereof—carries little, if any weight, because the challenged statute is new."). Likewise, this Court recently observed that there was a good reason for a lack of enforcement history when plaintiffs sued "before the [challenged law] went into effect." *Welty II*, 791 F. Supp. 3d at 834.[41]

Here, Plaintiffs have presented no evidence that actually demonstrates a history of enforcement of Section 1 of H.B. 1704, either as to Plaintiffs themselves or as to *anyone*. (Doc. No. 6 at 12-13; Doc. No. 35 at 2-5). Plaintiffs seek to blunt the significance of this by asserting an explanation as to the lack of enforcement history; they argue that "given the short duration [of Section 1's] application"—i.e., given that Section 1 of H.B. 1704 went into effect barely two weeks before Plaintiffs filed the Complaint, not even three weeks before Plaintiffs filed the Preliminary Injunction Motion, and just seven weeks before Plaintiffs filed the Preliminary Injunction Reply[42]—"it makes sense that there would be at best limited evidence of a history of enforcement."

[41] This case law suggests that not just any "plausible explanation" for lack of enforcement history supports discounting this factor. For example, the fact that enforcement officials positively disavowed enforcing a law in *any* circumstances certainly would not indicate that a court should discount this factor. Rather, a "plausible explanation" for lack of enforcement history supports discounting this factor if that explanation is not inconsistent with the possibility of (relatively imminent) enforcement against a plaintiff—for example, if the explanation is that the statute had been in effect only a very short time (as in *Christian Healthcare*) or if a statute had not yet gone into effect (as in *Welty II*).

[42] Consistent with a footnote above—wherein the Court observed that a plaintiff bears the burden of establishing standing at the time that an action was filed and *maintaining* standing thereafter—the Court discerns no prohibition on considering whether any enforcement of Section 1 of H.B. 1704 has taken place *following* the commencement of this action in the context of considering whether Plaintiffs have *maintained* standing.

(Doc. No. 6 at 12 (quoting *Christian Healthcare*, 117 F.4th at 849-50)). The short period during which Section 1 of H.B. 1704 has been in effect thus far certainly diminishes the weight that the Court should afford to the lack of enforcement history. *See Abbvie*, 2025 WL 1805271, at *9 ("Here, the history of past enforcement—or lack thereof—carries little, if any weight, because the challenged statute is new."). However, unlike *Welty II*, this is not a case where Plaintiffs sued—at least in this particular action[43]—*before* Section 1 of H.B. 1704 went into effect. *Welty II*, 791 F. Supp. 3d at 834 (observing that a lack of enforcement history did not weigh against finding a credible threat of enforcement when plaintiffs sued "before the [law] went into effect."). Further, unlike *Christian Healthcare*, this is also not a case where Plaintiffs have presented evidence of at least *some* enforcement (however minimal) of Section 1 of H.B. 1704. *Christian Healthcare*, 117 F.4th at 849-50 (observing, where plaintiffs indicated that the state "actively enforces the [at-issue statute]," that although "Plaintiffs have not provided the most probative evidence—a history of specific enforcement actions against [plaintiffs'] proposed conduct—the evidence that [state] does prosecute violations of" the at-issue statute "is relevant to the credibility of enforcement" and that "given the short duration of the [statute's applicability to the at-issue conduct], it makes sense that there would be at best limited evidence of a history of enforcement in those categories." (internal quotation marks and citations omitted)). Instead, Plaintiffs have presented *no* evidence—even seven weeks after Section 1 of H.B. 1704 went into effect (i.e., when Plaintiffs filed the Preliminary Injunction Reply)—that actually points to *any* enforcement of Section 1 of H.B. 1704.

In the Preliminary Injunction Reply, Plaintiffs resist the conclusion that there is no evidence of Section 1 of H.B. 1704 being enforced. Specifically, Plaintiffs assert that "Defendants

[43] In *Lucy I*, by contrast, Plaintiffs *did* sue prior to Section 1 of H.B. 1704 going into effect. (*Lucy I* Doc. No. 1). *Lucy I* was dismissed on June 26, 2026, four days before Section 1 of H.B. 1704 went into effect on July 1, 2026. This action was not filed until July 17, 2026—more than two weeks after Section 1 of H.B. 1704 went into effect.

have represented that H.B. 1704 is in effect and is being enforced, just not against Plaintiffs (yet) or individuals 'identified by Plaintiffs.' *See* Aug. 5, 2026 Hr'g Tr. 10:22–11:4, Dkt. No. 21." (Doc. No. 35 at 4 (quoting Doc. No. 21 at 10:22–11:4)). In asserting that Defendants have represented that Section 1 of H.B. 1704 is currently being enforced, Plaintiffs rely on a statement by Defendants' counsel made during the August 5, 2026 telephonic status conference held in this case. In that conference, the Court inquired as to Defendants' counsel's "current perception of the enforcement posture on [Section 1 of H.B. 1704] throughout the state of Tennessee[.]" (Doc. No. 21 at 10:19-22). Defendants' counsel responded: "I would just point out that it's been five weeks since [Section 1 of H.B. 1704] took effect. There's been no attempt to enforce this against [P]laintiffs or any other individuals identified by [P]laintiffs." (*Id.* at 10:22-11:1). It is quite clear that in these remarks, Defendants' counsel did not expressly represent that Section 1 of H.B. 1704 is currently being enforced against anyone. Rather, in these remarks, Defendants' counsel's *sole* representation as to the enforcement of Section 1 of H.B. 1704 was that it has *not* been enforced against Plaintiffs or any individuals identified by Plaintiffs.

Plaintiffs therefore are relegated to asserting that this remark by Defendants' counsel was an *implicit* representation that Section 1 of H.B. 1704 is currently being enforced. In so doing, Plaintiffs apparently rely upon the a variant of the maxim—one that is a recognized canon of statutory construction, but not a mandatory (or always reliable) principle for construing an individual's testimony or other statement—of *expressio unius est exclusion alterius*, meaning (upon translation from Latin to English) "the expression of one thing is the exclusion of the other," which is to say that a statement that refers to one or more things necessarily implies that all other things are outside the scope of the statement. Plaintiffs' reasoning seems to be that since Defendants' counsel's remark referred to only some persons (Plaintiffs or any other individuals

identified by Plaintiffs) as belonging in the category of persons against whom the law is not currently being enforced, then there must be persons who are excluded from that category and therefore persons against whom the law is currently being enforced. The Court, however, declines to adhere to this reasoning, finding that it is at base grounded in mere speculation as to what Defendants' counsel meant in making the statement and (relatedly) why Defendants' counsel used the particular words that were used in the statement. In short, the Court does not find it appropriate to infer from Defendants' counsel's remarks that there are at least some persons against whom Section 1 of H.B. 1704 is being enforced.

The upshot is that Plaintiffs have pointed to no history of enforcement of Section 1 of H.B. 1704 and that this lack of any enforcement history cuts against finding a credible threat of enforcement, though only to an attenuated extent given the short duration in which Section 1 of H.B. 1704 has been in effect.

That takes the Court to the next factor, namely enforcement warning letters sent to the Plaintiffs regarding their own conduct. *McKay*, 923 F.3d at 869. The Court has previously observed that in cases involving threatened *criminal* prosecutions—like the instant action—this factor is something of an odd factor to apply. Why? Because there is little indication generally that Tennessee district attorneys general (including the 12 district attorneys general who are defendants in this action)—the officials to whom Tenn. Code Ann. § 8-7-103 grants the authority to prosecute criminal offenses in Tennessee and therefore would seem to be the individuals tasked with making prosecutorial decisions with respect to Section 1 of H.B. 1704—have "a usual practice of sending a warning letter to a potential defendant before prosecuting [them], as other enforcement authorities sometimes do." *Welty v. Dunaway*, 749 F. Supp. 3d 882, 902 (M.D. Tenn. 2024) (hereinafter "*Welty I*"). However, the Sixth Circuit has suggested that the Court may, and indeed

should, consider whether warning letters have been sent even in the specific context of a pre-enforcement challenge to a Tennessee criminal statute. *See Friends of George's*, 108 F.4th at 439 (observing, when considering a pre-enforcement challenge to a newly enacted Tennessee criminal statute, that plaintiff "only contends that the third and fourth factors weigh in its favor. This is probably because there is no history of past enforcement of the [statute], and [Plaintiff] has received no warning letters [threatening enforcement of the criminal statute]."). Squaring *Welty I* and *Friends of George's*, the notion seems to be that although a history of letters warning of enforcement of a criminal statute would certainly be suggestive of there being a credible threat of enforcement of that statute, the *lack* of history of warning letters does not weigh much *against* there being a credible threat of enforcement. Here, it is undisputed that Plaintiffs have received *no* warning letters regarding their conduct being in violation of Section 1 of H.B. 1704 or otherwise threatening Plaintiffs with prosecution under Section 1 of H.B. 1704. And so, given the lack of warning letters, the Court finds that this factor cuts—even if only slightly—against there being a credible threat of enforcement.[44]

The Court next turns to the third factor—whether the challenged statute has an attribute that makes enforcement easier or more likely. *McKay*, 823 F.3d at 869. The Sixth Circuit has observed that the third factor "is most probative in cases"[45]—like the instant case—"without an

[44] Some case law suggests that when a law is new, a lack of warning letters is entitled to less weight. *Cf. Abbvie*, 2025 WL 1805721, at *9 ("the lack of enforcement warning letters has little bearing, given that the plaintiffs filed suit the day after [the governor signed the at-issue law]"). Here, the Court does not discern that the age of Section 1 of H.B. 1704 should necessarily cause the Court to minimize even further the weight placed to this second factor, because H.B. 1704 was signed into law on April 21, 2026, and so Tennessee district attorneys general could have begun sending letters warning of enforcement of Section 1 of H.B. 1704 from that date; for this reason, Section 1 of H.B. 1704 is less "new" than the law at issue in a case like, for example, *Abbvie*.

[45] It is not entirely clear whether this means that in these circumstances, this factor: (a) is the "most probative" of the *McKay factors* (i.e., is more probative than any other *McKay* factor), or, instead, (b) the "most probative" that it will ever get (i.e., is more probative than it would be in any other circumstances). Given the lack of the article "the" before "most probative" in the quote, however, the Court infers that this

express threat of enforcement." *Online Merchs. Guild*, 995 F.3d at 550. In examining this factor, the Sixth Circuit has held that one relevant consideration is whether the statute contains a "citizen-enforcement provision authorizing a member of the public to file complaints." *Plunderbund Media, L.L.C., v. DeWine*, 753 F. App'x 362, 371 (6th Cir. 2018). *See also Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (noting that the challenged law "contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints"). Put another way, "[s]tatutes that allow 'any person' to 'file a complaint' make enforcement more likely because the law's initiation is not limited to 'a prosecutor or an agency.'" *Christian Healthcare*, 117 F.4th at 850 (quoting *Driehaus*, 573 U.S. at 164). However, even without a citizen-enforcement mechanism, the statute still could have an attribute that makes enforcement easier or more likely, and under this factor courts look "to any features of a law that might make enforcement more likely, not merely whether there is a citizen enforcement mechanism." *Welty I*, 749 F. Supp. 3d at 902. The Sixth Circuit has also observed that this factor does not weigh in favor of finding a credible threat of enforcement when the challenged law is a "standard criminal law" with no "attributes making enforcement easier or more likely." *Friends of George's*, 108 F.4th at 440. *But cf. Yoder*, 146 F.4th at 525 (observing that a challenged statute "contains no potential for exemptions that make the threat of enforcement remote" and concluding that plaintiff had "shown a credible threat of enforcement sufficient to meet their burden for demonstrating a pre-enforcement injury.").[46]

---

means the latter rather than the former, i.e., that this factor is at *its* most probative under these circumstances. But either way, the factor stands out in importance in this case, which involves no history of enforcement.

[46] The propositions quoted from *Yoder* and *Friends of George's* seem to stand in tension with one another. *Friends of George's* stands for the notion that a statute being a "standard" criminal law—for instance a statute where investigative and prosecutorial decisions rest solely in the hands of law enforcement and prosecutors—would tend to cut against finding a credible threat of enforcement with respect to this factor. *Yoder*, on the other hand, suggests that a statute being a "standard" criminal law might cut in favor of

Here, Section 1 of H.B. 1704 does not contain any sort of citizen enforcement or citizen complaint provision. The Court also does not discern that there is anything else in Section 1 of H.B. 1704 that makes enforcement easier or more likely.[47] Plaintiffs argue that "the threat of

---

finding a credible threat of enforcement with respect to this factor if that statute otherwise "contains no potential for exemptions that make the threat of enforcement remote." *Yoder*, 146 F.4th at 525.

What seems to have happened is that *Yoder*, by asking whether something makes enforcement of the statute *remote*, reversed the third *McKay* factor's inquiry. The third *McKay* factor does not ask whether there is something in the statute that makes the threat of enforcement *remote*. Instead, the third *McKay* factor asks whether there is something in the statute that "that makes enforcement *easier or more likely*." *McKay*, 823 F.3d at 869 (emphasis added). In other words, *Yoder* seems to have put the inquiry backward, and *Yoder*'s framing of the inquiry—insofar as it asks whether there is something in the statute that makes enforcement especially remote, as opposed to easier or more likely—runs counter to the wide breadth of case law that asks, consistent with *McKay*, whether there is "an attribute of the challenged statute that makes enforcement easier or more likely." *McKay*, 823 F.3d at 869. *See also Christian Healthcare*, 117 F.4th at 850 (asking whether "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action."); *Friends of George's*, 108 F.4th at 439 (similar); *Online Merchs. Guild*, 995 F.3d at 550 (similar).

That is all to say, in evaluating this factor, the Court will not ask whether there is some attribute that makes enforcement of Section 1 of H.B. 1704 more *remote* and—as ultimately is even more relevant—will not treat the absence of attributes that make enforcement more *remote* as a circumstance that affirmatively supports finding an injury-in-fact. Instead, the Court will ask whether Section 1 of H.B. 1704 has attributes that makes enforcement more *likely* (or easier), with the understanding that *if* the answer to that question were to be yes, then *that* would be the circumstance under this factor that would support finding an injury-in-fact.

[47] The Court has previously observed in the context of a pre-enforcement challenge to a Tennessee criminal statute:

> As a practical matter, criminal cases are usually initiated by law enforcement, but, in Tennessee, that is not a requirement. Rather, Tennessee law requires that grand jury meetings be publicly announced with the following notice:
>
> > It is the duty of your grand jurors to investigate any public offense which they know or have reason to believe has been committed and which is triable or indictable in this county. Any person having knowledge or proof that an offense has been committed may apply to testify before the grand jury ....
>
> Tenn. Code Ann. § 40-12-105. As that mandatory notice suggests, "[a]ny person having knowledge or proof of the commission of a public offense triable or indictable in [a] county may testify before the grand jury" for that county, and the grand jury must consider the allegations—with the local [district attorney general] acting in only a consulting role. Tenn. Code Ann. § 40-12-104(a), (c). Accordingly, any person—such as, for example, an activist or a disgruntled peer or family member—could initiate grand jury proceedings for alleged [violations of a criminal statute, and this constitutes an attribute of the criminal statute that makes enforcement easier or more likely].

enforcement is [] heightened by the unusual statutory attributes of H.B 1704 [in that] the statute is extraordinary, seeking to claim for Tennessee a power that has been understood to be exclusively federal for well over a century." (Doc. No. 35 at 5). Yet, this argument conflates merits arguments—i.e., that Section 1 of H.B. 1704 impedes on a federal power—with arguments on standing. That is to say, even if the statute is flawed (constitutionally or otherwise)—and for that matter even if the statute is "extraordinary" due to its flaws or unusual nature—that does not make enforcement of the statute easier or more likely; indeed, all other things being equal, that might make enforcement harder or less likely.

Plaintiffs contend additionally that this factor weighs in favor of finding a credible threat of enforcement because Section 1 of H.B. 1704 "'contains no potential for exemptions that make the threat of enforcement remote'; indeed, the plain text of H.B. 1704 contains no exceptions and criminalizes Plaintiffs' mere existence in Tennessee." (Doc. No. 6 at 12 (quoting *Yoder*, 146 F.4th at 525)). However, consistent with the Court's discussion in a footnote above, the Court does not discern that the relevant inquiry is whether there is something in Section 1 of H.B. 1704 that makes the threat of enforcement more *remote*—for example the lack of exemptions or exceptions to

---

*Welty I*, 749 F. Supp. 3d at 902. So, in theory grand juries in Tennessee could investigate any sort of suspected criminal offense. However, the Court declines to interpret this power of grand juries as somehow investing Section 1 of H.B. 1704 with an attribute that makes enforcement easier or more likely. If the Court were instead to embrace this interpretation, it would seemingly follow that *every* criminal law in the state of Tennessee is invested with an attribute that makes enforcement easier or more likely, and this would render the third factor as always supporting the existence of a credible threat of enforcement in pre-enforcement challenges to Tennessee criminal laws. The Court's decision not to treat the power of grand juries in Tennessee to investigate criminal offenses as investing Section 1 of H.B. 1704 with an attribute that makes enforcement easier or more likely is buttressed by a recent opinion from the Sixth Circuit, *Friends of George's*. In that opinion, on which the Court has relied at various points herein, the Sixth Circuit concluded that a Tennessee criminal statute had no special attributes making enforcement easier or more likely, because it was a "standard criminal law"; the Court finds it telling that in so concluding, the Sixth Circuit did not even mention the possibility that a Tennessee grand jury could begin investigating potential violations of the statute at issue in that case. *Friends of George's*, 108 F.4th at 440.

criminal liability under Section 1 of H.B. 1704 mentioned in Plaintiffs' argument.[48] Rather the relevant inquiry here is whether there is something in the statute that makes enforcement easier or more likely. And consistent with the Court's discussion earlier in this paragraph, the Court discerns that there is nothing in Section 1 of H.B. 1704 that makes enforcement of Section 1 of H.B. 1704 easier or more likely. Put another way, the Court finds that Section 1 of H.B. 1704 is a "standard criminal law" without "attributes making enforcement easier or more likely," so that the third factor cuts against finding a credible threat of enforcement. *Friends of George's*, 108 F.4th at 440.

The Court will now turn to the last factor—whether Defendants have disavowed enforcement of Section 1 of H.B. 1704. This factor "focuses on a 'particular plaintiff [or plaintiff's conduct].'" *Friends of George's*, 108 F.4th at 440 (quoting *Online Merchs. Guild*, 995 F.3d at 550).[49] That is to say, "a[] [state's] assertion that it intends to enforce its laws in the abstract—and not against the specific conduct that the plaintiff plans to undertake—does not meaningfully

---

[48] The Court also notes that the lack exemptions or exceptions to criminal liability would not be probative as to this factor (as properly understood), for two reasons. First, in the undersigned's experience, most criminal statutes do not actually have "exemptions" or "exceptions." Most criminal statues limit (circumscribe) criminal liability not with exemptions or exceptions, but rather via the articulation of multiple elements that (axiomatically and obviously) each need to be proven beyond a reasonable doubt for criminal liability to ensue.

Second, the Plaintiffs' argument as to the lack of exemptions or exceptions to *criminal liability* (i.e., conviction) does not actually address whether the threat of *enforcement* (i.e., prosecution or arrest) is more likely. Even assuming that a lack of exemptions or exceptions to criminal liability makes *criminal liability* (i.e., conviction) more likely in the event that the statute is *enforced* (via an arrest and/or prosecution thereunder), that does not mean that enforcement (i.e., prosecution and/or arrest thereunder) is itself more likely.

[49] Notably, *Friends of George's* stated this particular proposition in terms of this factor focusing "on a 'particular *plaintiff*.'" *Friends of George's*, 108 F.4th at 440 (emphasis added) (quoting *Online Merchs. Guild*, 995 F.3d at 550). However, consistent with the Sixth Circuit's opinion in *Christian Healthcare*—from which the Court quotes extensively above—the inquiry as to this factor alternatively can be framed in terms of a particular plaintiff's *conduct*. That is to say, the inquiry can be focused on whether the state has disavowed enforcement either as to a particular plaintiff's *conduct* or as to a particular plaintiff, and herein the Court analyzes this particular factor in terms of disavowal (or lack thereof) of enforcement of Section 1 of H.B. 1704 as to Plaintiffs themselves *and* as to Plaintiffs' conduct.

increase the risk of enforcement," *Christian Healthcare*, 117 F.4th at 850 (citing *Davis*, 51 F.4th at 174), [but] "where a defendant refuses to disavow enforcement 'against a particular plaintiff' with respect to the plaintiff's specific conduct, [Sixth Circuit] precedent treats enforcement as more credible." *Id.* (quoting *McKay*, 823 F.3d at 869). In the context of this factor, the Sixth Circuit has observed that it is "unrealistic to expect a defendant to disavow a law's enforcement as applied to 'fluid and future facts' that are unclear," *id.* (quoting *Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011)), but that "[b]y contrast, refusing to disavow is less understandable—and enforcement more credible—where there is not 'a single additional fact that would be required to adjudicate the present action.'" *Id.* at 851 (quoting *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023)).

Here, it is clear that Defendants have not disavowed enforcement of Section 1 of H.B. 1704 either as to Plaintiffs themselves or as to Plaintiffs' particular conduct,[50] and this factor weighs in favor of finding a credible threat of enforcement. Defendants resist this conclusion, arguing that "Plaintiffs do not show that anyone ever asked Defendants before this lawsuit about how [Defendants] will enforce [Section 1 of H.B. 1704] against these Plaintiffs and their specific circumstances." (Doc. No. 26 at 9). This argument is unavailing because Defendants identify no case law to suggest that in order for this factor to weigh in favor of there being a credible threat of enforcement, a plaintiff (or some other relevant person) must affirmatively ask an enforcing authority about its enforcement posture toward that plaintiff. Defendants argue additionally that they have never "been confronted with a concrete set of facts and yet refused to disavow

[50] Plaintiffs' conduct here is failing or refusing to depart Tennessee within the 90-day window despite being "alien[s]", who are each eighteen years of age or older, "against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a)." H.B. 1704, § 1.

enforcement." (*Id.* at 9). The Court disagrees, finding that in essence Defendants, via this case and *Lucy I*, have been given a "concrete" set of facts about Plaintiffs; Plaintiffs have disclosed a great deal of relevant and clear-cut facts about themselves—including Plaintiffs' immigration statuses, Plaintiffs' check-ins with the federal government in connection with their immigration statuses, and various other personal details of Plaintiffs' lives—in connection with *Lucy I* and in connection with the instant action. It is unclear to the Court what more information that Defendants would need in order to disavow enforcement of Section 1 of H.B. 1704 as to Plaintiffs themselves or as to Plaintiffs' specific conduct. So, the Court does not discern that this is one of those cases where the facts are unclear so that it is "unrealistic to expect a defendant to disavow a law's enforcement." *Christian Healthcare*, 117 F.4th at 850. Thus, the Court finds that this particular factor weighs in favor of finding a credible threat of enforcement.

So, the Court has found that only one of the *McKay* factors—the disavowal factor—weighs in favor of finding that Plaintiffs have sufficiently established a credible threat of enforcement of Section 1 of H.B. 1704 so as to have shown an injury-in-fact. Of course, as the Court observed above, the *McKay* factors need not "each be established" for a plaintiff to establish a credible threat of enforcement. *Online Merchs. Guild*, 95 F.3d at 550 (quoting *McKay*, 823 F.3d at 869). Even so, Sixth Circuit precedent generally stands for the notion that if just one of these factors weighs in favor of there being credible threat of enforcement, then the plaintiff has not established a credible threat of enforcement. *See e.g., Christian Healthcare*, 117 F.4th at 851 ("At day's end, 'some combination' of the *McKay* factors are typically required to demonstrate a credible threat of enforcement." (quoting *Online Merchs. Guild*, 995 F.3d at 550)); *Davis*, 51 F.4th at 174 (noting that refusal to disavow is "just one data point among many on the question whether a credible threat of enforcement exists"). That is all to say that the Court does not discern that the absence of

Defendants' disavowal of enforcement of Section 1 of H.B. 1704—standing alone—is sufficient for Plaintiffs to have shown a credible threat of enforcement so as to have shown an injury-in-fact (as required to establish standing).

Resisting the Court's conclusion above, Plaintiffs argue in their Preliminary Injunction Reply that the Sixth Circuit "has [in the past] concluded that, despite the absence of past enforcement, plaintiffs [can] establish[] a credible fear of prosecution where the challenged law 'clearly prohibited the activities' in which plaintiffs sought to engage and the state 'refus[ed] to disavow enforcement,'" (Doc. No. 35 at 4 (quoting *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1024 (6th Cir. 2024) (discussing *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.,* 769 F.3d 447, 452 (6th Cir. 2014))) (citing *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015))), and therefore (according to Plaintiffs) Plaintiffs have made out a credible threat of enforcement of Section 1 of H.B. 1704 in this case.

The Sixth Circuit *has* stated that there can be a "credible fear of prosecution where the challenged law 'clearly prohibited the activities' in which plaintiffs sought to engage and the state 'refus[ed] to disavow enforcement,'" (Doc. No. 35 at 4 (quoting *Kareem*, 95 F.4th at 1024)), but it is important to note the context in which the Sixth Circuit has made this statement. [51] For instance, in *Platt*, the opinion being discussed in the portion of *Kareem* quoted by Plaintiffs in the Preliminary Injunction Reply, the Sixth Circuit considered a plaintiff's standing to bring a pre-enforcement challenge to the Ohio Code of Judicial Conduct (the "Code"). That challenge was

[51] This statement might seem to be in conflict with the previously stated principle that "'some combination' of the *McKay* factors are typically required to demonstrate a credible threat of enforcement." *Christian Healthcare*, 117 F.4th at 851. But the Court need not resolve this potential conflict because this statement ultimately is inapplicable in the instant case, given that this statement has been made in contexts that are markedly different from the context of the instant case (as the Court explains below).

based in part on the Free Speech Clause of the First Amendment.[52] 769 F.3d at 451-52. In *Platt*, the Sixth Circuit concluded that the Code "'at least chill[ed], and in some instances prohibit[ed] [the plaintiff's desired] forms of communication,'" thereby requiring plaintiff to "'censor [ ] himself' to avoid violating the Code." *Id.* (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010)). The Sixth Circuit found that "[such self-censoring] amounts to a credible fear of enforcement," a "fear" that was bolstered by the defendant's refusal to disavow enforcement of the Code as well as a citizen enforcement mechanism implemented in the Code. *Id.* (quotation marks omitted)). That is to say, and as the *Kareem* decision reiterates in its discussion of *Platt*, *Platt* seems to stand for the proposition that, in a *First Amendment context*, a plaintiff's "'asserted fear [of enforcement is] credible' [so as to establish an injury-in-fact where] the [law at issue] clearly prohibited the activities [i.e., speech and other protected conduct] in which [plaintiff] sought to engage," thereby leading a plaintiff to self-censor. *Kareem*, 95 F.4th at 1024. In other words, in the context of a challenge *based on an alleged violation of the Free Speech Clause*, the plaintiff's *self-censoring* (to avoid clearly prohibited but allegedly protected conduct) enables the plaintiff to be treated as establishing a credible fear of enforcement where it otherwise could not be established.

Likewise in *Green Party of Tenn.*—another case discussed by the Sixth Circuit in *Kareem* and relied on by Plaintiffs in support of their argument that there can be a "credible fear of

---

[52] The *Platt* decision does not specify whether the challenge to the Code was specifically based on the Free Speech Clause of the First Amendment and instead notes generally that the challenge to the Code was based on the "First and Fourteenth Amendments." 769 F.3d at 451. With that said, the Court discerns for two reasons that the at-issue challenge to the Code in *Platt* was a challenge that was based, at least in part, on the Free Speech Clause of the First Amendment. First, the *Platt* decision discusses the at-issue challenge in *Platt* in the context of "protected speech" and a desire to engage in "political speech [] implicating the First Amendment." *Id.* at 451-52. Second, in the underlying district court proceedings, the plaintiff in his complaint characterized his challenge to the Code as, in part, "an action to vindicate core First Amendment rights of free speech." *Platt et al v. Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court et al*, 1:13-cv-00435, Docket No. 1 at 6 (S.D. Ohio June 20, 2013).

prosecution where the challenged law 'clearly prohibited the activities' in which plaintiffs sought to engage and the state 'refus[ed] to disavow enforcement'" (Doc. No. 35 at 4)—the Sixth Circuit considered (among other things and as relevant here) a pre-enforcement challenge that was based (at least in part) on the Free Speech Clause of the First Amendment,[53] to a Tennessee state law: T.C.A. § 2–1–114. In *Green Party of Tenn.* the Sixth Circuit concluded that plaintiffs in that case had established standing to challenge a particular Tennessee state law—T.C.A. § 2–1–114—where "defendants [had] not enforced or threatened to enforce [the] statute against plaintiffs or any other political party" but where "[defendants] also [had] not explicitly disavowed enforcing it in the future." 791 F.3d at 696. *Green Party of Tenn.* on its face might appear to support the notion that Plaintiffs have shown a credible threat of enforcement in this case given that, as discussed above, Defendants have not disavowed enforcement of Section 1 of H.B. 1704. But this appearance is deceiving. As the Sixth Circuit explained in *Kareem*, interpreting *Green Party of Tenn.*, "[a]lthough [in *Green Party of Tenn.*] the 'defendants ha[d] not enforced or threatened to enforce [the] statute against' *any* political party, we determined that it carried a sufficiently credible threat of enforcement to establish a *free speech harm* since the state 'ha[d] not explicitly disavowed enforcing [the law] in the future.'" *Kareem*, 95 F.4th at 1024 (second emphasis added) (quoting *Green Party of Tenn.*, 791 F.3d at 696). And in fact, in *Kareem* itself the Sixth Circuit evaluated a

[53] Although the Sixth Circuit's opinion in *Green Party of Tenn.* is not explicit that the challenge to T.C.A. § 2–1–114 was based on the Free Speech Clause of the First Amendment, the Court discerns that this was the case, given the Sixth Circuit's characterization of the plaintiffs' argument in *Green Party of Tenn.* as being that "Section 2–1–114 unconstitutionally impairs their *free speech rights*." 791 F.3d at 696 (emphasis added). The Court's conclusion that the challenge to T.C.A. § 2–1–114 was based, at least in part, on the Free Speech Clause of the First Amendment is buttressed by the lower court proceedings in that case, where the district court concluded that "Tenn. Code Ann. § 2–1–114 requiring the disavowal of certain purposes of Plaintiffs' advocacy, violates Plaintiffs' First Amendment rights to free speech." *Green Party of Tennessee v. Hargett*, 7 F. Supp. 3d 772, 776 (M.D. Tenn. 2014), *aff'd in part, vacated in part*, 791 F.3d 684 (6th Cir. 2015).

pre-enforcement challenge, which was based on the Free Speech Clause of the First Amendment,[54] to an Ohio law and ultimately concluded that the plaintiff in that case had demonstrated an injury-in-fact where the plaintiff "understandably fear[ed] [engaging in the proscribed speech]." *Kareem*, 95 F.4th at 1024.

In other words, what seems to be animating cases where the Sixth Circuit has indicated that "plaintiffs [can] establish[] a credible fear of prosecution where the challenged law 'clearly prohibited the activities' in which plaintiffs sought to engage and the state 'refus[ed] to disavow enforcement'" (Doc. No. 35 at 4 (quoting *Kareem*, 95 F.4th at 1024)) is a recognition of something constituting an injury-in-fact *different in kind* from the threat of enforcement officials enforcing or prosecuting under the law at issue, even if the Sixth Circuit uses the terminology of a "credible threat" of enforcement to describe this injury. That is to say, in cases where the plaintiff(s) challenge a statute implicating the Free Speech Clause of the First Amendment, the Sixth Circuit seems to be concerned about an injury derived from a sort of self-censorship, or as they describe it, "a free speech harm." *Kareem*, 95 F.4th at 1024. *See also Friends of George's*, 108 F.4th at 450 (observing that an injury can result from a "well-founded fear" that a law will be enforced against a plaintiff because "'self-censorship' is 'a harm that can be realized even without an actual prosecution.'" (citations omitted)) (Mathis, J., dissenting). So, where a *free-speech right* is implicated by a statute challenged in a pre-enforcement suit, then a plaintiff might be able to make out an injury where the challenged statute "clearly prohibit[s] the activities" in which plaintiffs seek to engage and where the defendants "refus[ed] to disavow enforcement." *Kareem*, 95 F.4th at 1024. One might think of it this way: under these circumstances, the act of self-censorship itself

[54] Unlike in *Platt* and *Green Party of Tenn.*, *Kareem* discusses the challenge in that case specifically in the context of the Free Speech Clause of the First Amendment, *see Kareem*, 95 F.4th at 1022, and so the Court discerns that the challenge in *Kareem* was based on the Free Speech Clause of the First Amendment.

reflects a kind of enforcement of the law—a form of enforcement that the plaintiff (for good reason) imposes *upon himself or herself*—so that it is unnecessary to show a credible threat of enforcement *by applicable enforcement authorities*.

The instant action, however, does not involve any asserted violations (via "chilling" or otherwise) of rights guaranteed by the Free Speech Clause (or, for that matter, any other clause) of the First Amendment stemming from Section 1 of H.B. 1704. Relatedly, it does not involve any risk of self-censorship; to refrain from conduct clearly prohibited by Section 1 of H.B. 1704, Plaintiffs would not need to self-censor, but rather would need simply to depart from the state of Tennessee.[55] In other words, any so-called chilling of Plaintiffs would be of their physically remaining in Tennessee, and not of their exercise of any rights protected by the Free Speech Clause of the First Amendment, and so the cases upon which Plaintiffs rely are simply inapplicable.

The upshot is that the Court does not discern this to be a case where, because Plaintiffs are going to engage in activities "clearly prohibited" by Section 1 of H.B. 1704, Plaintiffs have shown an injury *merely* because Defendants have refused to explicitly disavow enforcement of the law. And this means, as previously indicated, that Plaintiffs' argument here misses the mark.

Cognizant of the fact that the *McKay* factors are not exhaustive, *Online Merchs. Guild*, 995 F.3d at 550, the Court will address one additional argument raised by Plaintiffs in contending that there is a credible threat of enforcement. Plaintiffs seem to argue that Defendants requesting a bond in connection with Plaintiffs' requested preliminary injunction in *Lucy I* and Plaintiffs' requested preliminary injunction in this action weighs in favor of their being a credible threat of enforcement. (Doc. No. 6 at 12 ("Defendants also sought a hefty injunction bond [in *Lucy I*]

[55] Moreover, Plaintiffs' argument misses the mark for the additional reason that Plaintiffs have shown no inclination to actually comply with Section 1 of H.B. 1704. That is to say, since Plaintiffs do not seem like they are going to comply with the law, then the Court fails to see how Plaintiffs can claim that they have suffered any chill a result of the law.

indicating that they anticipated enforcement against many if not all members of the [Putative Class]."); Doc. No. 35 at 3 ("Defendants plainly envision that H.B. 1704 will be broadly enforced; their request for an injunction bond indicates they anticipate enforcement will result in potentially the entire [Putative Class] being removed from the State.")). Even assuming that a request for an injunction bond does indicate an intention on behalf of Defendants to enforce Section 1 of H.B. 1704 widely, this does not bear on whether Plaintiffs have established a credible threat of enforcement as to *themselves*—which is the relevant inquiry in this context. *Kiser*, 765 F.3d at 609 ("A plaintiff asserting standing to challenge a law before it has been enforced against him must show a 'credible fear' that the state or its agents will in fact enforce the law in his case." (emphasis added)). And, crucially, Plaintiffs cannot rely on a purported threat of enforcement of the statute as to members of the Putative Class to establish standing for themselves. *See e.g., Perry v. Allstate Indem. Co.*, 953 F.3d 417, 420 (6th Cir. 2020) ("[P]otential class representatives must demonstrate 'individual standing vis-à-vis the defendant; [they] cannot acquire such standing merely by virtue of bringing a class action.'" (quoting *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)))). So, this argument does not avail Plaintiffs.

To recap, only one of the *McKay* factors—refusal to disavow—weighs in favor of finding a credible threat of enforcement, and none of Plaintiffs' arguments otherwise convince the Court that Plaintiffs have shown an injury-in-fact. Of course, the Court realizes that in all likelihood, Plaintiffs are persons within the scope of Section 1 of H.B. 1704 and in this sense are subject to Section 1 of H.B. 1704. However, for the reasons stated by the Court above, merely being *subject to* a statute is not enough to establish standing. And considering what actually *is* (and is not)

sufficient to establish standing, the Court concludes that Plaintiffs have not established standing[56] for the purposes of the issuance of a preliminary injunction. The Preliminary Injunction Motion (Doc. No. 6) can (and will) be denied on these grounds.[57]

**2. Remaining Motions**

That leaves the Class Certification Motion (Doc. No. 7) and the Pseudonym Motion (Doc. No. 8). The Court will discuss each of these motions in turn.

a. The Class Certification Motion

With respect to the Class Certification Motion (Doc. No. 7), Plaintiffs seem to have sought class certification at this early stage of the litigation so as to permit their requested preliminary injunction—if it were to be granted—to provide *class-wide* preliminary injunctive relief. Given that the Court is denying the Preliminary Injunction Motion, the Court does not discern that it would be an effective use of scarce judicial resources to adjudicate the Class Certification Motion

---

[56] In its discussion of standing, the Court has discussed standing generally as to "Plaintiffs"—i.e., *both* Plaintiffs in this action. As noted above, however, standing is plaintiff-specific and claim specific. And so, if even one plaintiff in this action established standing as to the sole claim in this action, then the Court would be able to reach the merits of the sole claim in this action (at least as to that particular plaintiff).

With that said, although the Court has discussed its standing analysis generally as to "Plaintiffs," the Court has not assumed that just because one plaintiff in this action lacks standing, the other plaintiff *also* lacks standing. Instead, the Court has separately assessed the record as to each plaintiff in this action to determine whether either plaintiff (i.e., Lucy or Benjamin) has standing, and for the reasons described herein, the Court has found that neither plaintiff has standing.

[57] At this stage, the Court concludes that Plaintiffs have not satisfied their burden to establish standing for the purposes of *the issuance of a preliminary injunction*. The Court's opinion herein neither addresses nor should be taken to address whether Plaintiffs have made sufficient allegations so as to establish standing for the purposes of avoiding dismissal of this action. The Court will address such issue—if necessary—when it adjudicates Defendants' pending motion to dismiss at Docket No. 41, wherein Defendants also argue that Plaintiffs' Complaint has not sufficiently *alleged* standing.

Additionally, having denied the Preliminary Injunction Motion on the specific grounds that Plaintiffs have not satisfied their burden to establish an injury-in-fact for purposes of the issuance of a preliminary injunction, the Court will not address any of Defendants' other arguments as to why the Preliminary Injunction Motion should be denied.

now rather than later. So the Court will **DEFER** decision on the Class Certification Motion to a later date.

b. The Pseudonym Motion

That takes the Court to the Pseudonym Motion. As the Court noted above, via the Pseudonym Motion, Plaintiffs "seek leave to proceed pseudonymously, under the following [respective] pseudonyms: Lucy and Benjamin." (Doc. No. 8 at 2).

As a general matter, a complaint must name all parties. *See Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). The court may allow plaintiffs to proceed under a pseudonym where the plaintiffs show that their "privacy interests substantially outweigh the presumption of open judicial proceedings." *Id.* In determining whether plaintiffs have met this burden, courts in the Sixth Circuit consider the following factors (which are known as the *Porter* factors): "(1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiffs to disclose information of the utmost intimacy; (3) whether the litigation compels plaintiffs to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiffs are children." *Id.* (internal quotation marks omitted). "A plaintiff does not have to fulfill every *Porter* factor to be allowed to proceed under a pseudonym, and no one *Porter* factor is dispositive in the outcome of such a decision." *Doe v. Sumner Cnty. Bd. of Educ.*, No. 23-cv-00498, 2025 WL 3896598, at *2 (M.D. Tenn. June 2, 2025). The *Porter* factors are not exhaustive; in determining whether a plaintiff should be allowed to proceed under a pseudonym in a pending lawsuit, courts can consider other relevant factors as put forth by the parties, *Doe v. Metro. Gov't of Nashville & Davidson Cnty. Tennessee*, Civ. No. 3-21-CV-00038, 2022 WL 2293898, at *2, *4 (M.D. Tenn. June 24, 2022) (explaining that the *Porter* factors are non-exhaustive), such as whether defendant(s) would be prejudiced by permitting

plaintiff(s) to proceed pseudonymously, *Doe v. Fedex Ground Package Sys., Inc.*, Case No. 3:21-cv-00395, 2021 WL 5041286, at *5 (M.D. Tenn. Oct. 29, 2021), and whether the "party's need for anonymity outweighs [] the public interest in knowing the party's identity." *K.S. v. Detroit Public Schs.*, No. 14-12214, 2015 WL 13358204, at *3 (E.D. Mich. July 22, 2015) (quoting *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000)).

Here, application of the relevant factors shows that granting the Pseudonym Motion is warranted. Specifically, in this case Plaintiffs are "suing to challenge governmental activity"—i.e., they are suing to enjoin enforcement of Section 1 of H.B. 1704, which is a Tennessee state criminal statute. Likewise, this action has required Plaintiffs to disclose information about their unlawful immigration statuses, which the Court finds is a "matter of the utmost intimacy." *Cf. C.M. v. United States*, No. 21-cv-00234, 2021 WL 1822305, at *2 (W.D. Tex. Mar. 31, 2021) ("[C]ourts have repeatedly recognized that a plaintiff's vulnerable immigration status is sufficiently sensitive and personal in nature to warrant the use of a pseudonym."). Moreover, the Court cannot identify, and Defendants (who do not oppose the Pseudonym Motion) do not identify, any prejudice that Defendants would suffer from Plaintiffs proceeding pseudonymously in this action. Likewise, the Court does not discern that the public's interest in knowing Plaintiffs' identities outweighs the Plaintiffs' interest in anonymity in these circumstances.

Accordingly, being both unopposed and substantively meritorious, the Pseudonym Motion (Doc. No. 8) will be **GRANTED**. Therefore, Plaintiffs shall be permitted to proceed in this action under their requested pseudonyms: Lucy and Benjamin.

## CONCLUSION

For the reasons stated herein, the Preliminary Injunction Motion (Doc. No. 6) will be **DENIED**, decision on the Class Certification Motion (Doc. No. 7) will be **DEFERRED**, and the Pseudonym Motion (Doc. No. 8) will be **GRANTED**.

An appropriate corresponding order will be entered.

Eli Richardson
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE